[No. 49701-4-I. Division One. January 6, 2003.]

ARMEN YOUSOUFIAN, *Appellant*, v. THE OFFICE OF KING COUNTY EXECUTIVE, ET AL., *Respondents*.

---

*David J. Balint* (of *David J. Balint, P.L.L.C.*) and *Michael G. Brannan* (of *Law Offices of Michael G. Brannan*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Janine E. Joly, Deputy*, for respondents.

COLEMAN, J. — Armen Yousoufian successfully sued King County for violating the public disclosure act (PDA), but claims the trial court awarded him an insufficient amount of statutory penalties and attorney fees. We affirm the attorney fee award, but we reverse the trial court's award of the minimum statutory penalty. The trial court's unchallenged findings of egregious mishandling of Yousoufian's record request and a lack of good faith by the county do not support a minimum penalty. Further, the trial court improperly relied on the amount of the attorney fee award in determining the appropriate statutory penalty.

## FACTS

On May 30, 1997, Armen Yousoufian faxed and mailed a public records request to the Office of the Executive of King County. Yousoufian had heard King County Executive Ron Sims speaking on a radio broadcast about the upcoming referendum election in which voters would decide whether to build and finance a new football stadium in Seattle. During the broadcast, Sims referred to several studies that had been conducted regarding the impact of sports stadiums on the local economy, one of which was referred to as the "Conway study." Yousoufian's written request asked for two numbered categories of information. First, he asked to

review certain studies concerning the effects of a fast food tax on consumers. Second, he asked for

> All file materials relating to, and including, the widely quoted "Conway Study" that many politicians have referred to in connection with the economic impacts of sports stadiums and any other such studies.
>
> What I wish to see not only includes the study itself, including any and all addenda, attachments, updates, etc. but all related records including, but not limited to, how and why and by whom the study was ordered, its cost, and any previous or subsequent studies on sports stadiums.

The letter went on to state that Yousoufian had been in Sims' office the day before and had viewed the Conway study, but that several attachments were missing that he wished to see.

Yousoufian's letter was routed to office manager Pam Cole for a response. On June 4, 1997, Cole sent a letter to Yousoufian indicating that his request had been received, that the Conway study was available for him to review, and that archives were being searched for other documents responsive to his request. The letter estimated that it would take three weeks to conduct this search. On June 10, Yousoufian was able to view the Conway study with its attachments, along with one other study that the county found to be responsive to his records request.

On June 20, 1997, the executive's office received another letter from Yousoufian in which Yousoufian protested the three-week delay for the remaining documents. Yousoufian's letter pointed out that the restaurant study in particular could not be in the archives because the tax it analyzed was passed very recently. On the same day, Cole sent an electronic mail message to Sims asking about the restaurant reports. Sims replied, stating "I don't have the reports. He should ask the Restaurant association." Cole sent a letter to Yousoufian that same day in which she directed him to request the study from the Washington State Restaurant Association. The trial court found that "[t]here is no evidence as to why this correspondence could

not have occurred within five days of May 30th, other than through negligence." Cole's letter also indicated she would contact Yousoufian the following week regarding the rest of his request.

On June 12, Linda Meachum, who had assumed Cole's duties with regard to Yousoufian's request, contacted the King County Department of Stadium Administration and asked that department to search for any documents responsive to Yousoufian's request. Steve Woo, an administrative assistant at stadium administration, was assigned the task of responding to the request. There is no evidence that Meachum told the staff at stadium administration that the task was time sensitive, and Woo apparently had no knowledge of the PDA or training in responding to PDA requests. The record indicates there was no further communication from the county until July 15 when Woo talked with Yousoufian on the phone. During that conversation, Woo told Yousoufian that there was another Conway study related to football, conducted in 1996. Yousoufian had previously viewed the study related to baseball. On July 25, Woo sent Yousoufian the second Conway study, along with a letter indicating the cost of the Conway study and another study commissioned by the county. Woo did not include the cost documentation Yousoufian had asked for, and the cost information that was provided was later determined to be incorrect. Woo concluded the letter by stating that he hoped Yousoufian's questions had all been answered and asking him to call if he needed any more information.

On August 21, 1997, Yousoufian wrote Sims to express frustration with the fact that his request had not been completely answered. He also expressed his anger over the fact that the second Conway study had not been disclosed immediately. He again requested cost documentation for the studies. In response, Woo allowed Yousoufian to view four more studies. Woo e-mailed Linda Meachum on August 26 to explain his interactions with Yousoufian. Woo expressed frustration with the situation and stated that he was unsure how to respond to Yousoufian's request. The

trial court found that Woo tried to cooperate with Yousoufian but was not adequately trained or knowledgeable to handle the request.

On August 27, 1997, Sims sent a letter in response to Yousoufian's angry letter of August 21. The letter stated that Sims' office had interpreted Yousoufian's original letter as a request for information relating only to the baseball stadium. The letter also stated that the Office of the Executive interpreted all information requests as requests for records housed within that office and implied that the executive office's coordination with stadium administration was a gratuitous extra step. The letter stated that Linda Meachum was conducting a search of that office's archives and asked Yousoufian to contact stadium administration if he wanted them to search their archives as well. With regard to this letter, the trial court found that it was "not reasonable to ask Mr. Yousoufian where to search for the documents responsive to his request."

On October 2, 1997, Yousoufian sent another letter complaining that his request had still not been answered. He again asked for cost documentation. Meachum responded with a letter dated October 9, in which she stated that her office had already provided all the documents in its possession pertaining to the May 30 request. Meachum advised Yousoufian to be very specific in future requests. On the same day, Yousoufian received a letter from Desiree Leigh notifying him that the archival search had been performed and that documents responsive to his request were being forwarded to the county's attorneys for review. The letter estimated that the documents would be available within two weeks. Also on that same day, Woo faxed a letter to Yousoufian explaining that two more studies could be found on the King County web site. Woo sent both studies to Yousoufian on October 10. He also provided information, but no documentation, on the cost of one of the reports.

On October 14, Yousoufian sent another letter to Sims to express confusion and frustration with the apparently conflicting communications he was receiving from different

county employees. A King County deputy prosecuting attorney wrote back stating that she had reviewed Yousoufian's original request and believed it had been fully answered. She stated that the archive search had been completed and that two boxes of documents had been retrieved that she said were not responsive to Yousoufian's original request, but related generally to the Kingdome. She invited Yousoufian to view the documents and commented on the difficulty she had interpreting Yousoufian's original records request.

Yousoufian viewed the two boxes of documents on October 28. He made several attempts to arrange a time to view them sooner, but he was not allowed to view them during office hours unless particular staff members were present. He made 132 copies of documents. He later sent a letter to Meachum thanking her for her professionalism during "my three hours of inspecting, at long last, the documents I had originally requested in my May 30, 1997, Public Disclosure Request."

On December 8, 1997, Yousoufian's attorney wrote to Sims stating that his original records request had still not been completely satisfied. The letter outlined the types of records Yousoufian was seeking, including contracts or bills for the studies, bidding documents, or memos discussing the hiring of consultants to conduct the studies. Cole sent an e-mail to Woo and others requesting the documentation. Woo responded on December 12, listing the documents he had already provided and stating that he believed he had responded completely to Yousoufian's request. He expressed frustration with what he saw as Yousoufian's expanding universe of requested materials. Woo indicated that he would generate the other information regarding costs, but there is no indication in the record that he ever did so. Sims' chief of staff, John Wilson, wrote Yousoufian's attorney on December 15, 1997, and outlined the documents the county had already disclosed. Wilson told Yousoufian to direct any further requests for information to the Public Facility District.

Yousoufian's attorney responded with another letter on December 31, 1997. The letter again requested disclosure of documents responsive to Yousoufian's original request, protested the county's lack of response, and informed the county that Yousoufian would file a lawsuit if his request was ignored. A deputy prosecutor wrote back, stating that the executive's office constituted one "agency" under the PDA, and therefore, "the executive is obligated to produce only those documents which are retained by his office. In fact, by expanding the document search to the Department of Stadium Administration in the spirit of service, the executive greatly exceeded the statutory requirements for response under the [PDA]." The letter also stated that the county's "generous effort" had cost the county "hundreds of hours of staff time."

Yousoufian's attorney wrote back and reiterated his request for the documents and asked that the executive direct them to the appropriate office if the records were housed elsewhere within the county. The county's attorney responded on March 24, 1998, and advised Yousoufian to write the finance department. Yousoufian's attorney sent another records request to the finance department on April 29, 1998. After receiving no response, he sent another letter on June 8, 1998. On June 22, 1998, the same deputy prosecutor who had responded on behalf of the executive wrote back on behalf of the finance department, stating that the department did not have the requested documents. It was later discovered that the finance department did, in fact, have those records.

Yousoufian filed this lawsuit in March 30, 2000. In February 2001, another county employee, Pat Steel, was asked to assist in efforts to locate documents responsive to Yousoufian's request. She requested a list of archived records from King County Archives, marked any records that she thought might relate to Yousoufian's request, and then contacted the separate county departments where the records were archived and asked them to help in retrieving the marked records. The trial court found that this proce-

dure was "the appropriate way to handle a PDA request, and the procedure that could and should have been employed in 1997." A number of records were uncovered in the Department of Finance that were not earlier disclosed because, it was discovered, the Department of Finance was unable to retrieve records by subject and was able to retrieve them only by contract names and contract numbers. The Department of Finance never informed Yousoufian of this difficulty in 1997 or 1998.

After Steel's more thorough search, Yousoufian finally received the majority of the cost documentation on March 7, 2001. He also received two economic impact studies that were not previously disclosed. In addition, more cost information was provided on March 19, 2001, and April 20, 2001. The trial court stated that "[t]here is no evidence as to why these could not have been provided in 1997." The court further found that "as of trial, a reasonable disclosure of documents has now been made. Any miscellaneous documents not yet produced are non-responsive not warranting either findings or a fine."

The trial court ruled that King County failed to adequately respond in good faith to Yousoufian's request. The court, however, found that the county's failure to respond was not "bad faith" in the sense that it was intentional, but rather was the result of negligence, poor communication between county departments, and lack of diligence and care on the part of county employees. The trial court awarded Yousoufian attorney fees in the amount of $88,976.26, and statutory penalties of $25,440, for a total award of $114,416.26.

## STANDARD OF REVIEW

 Courts review agency actions de novo under the PDA. RCW 42.17.340(3). Once a violation of the PDA has been established, courts are required to award reasonable attorney fees and statutory penalties. RCW 42.17.340(4); *King County v. Sheehan*, 114 Wn. App. 325, 334, 57 P.3d 307

(2002). But the appropriate amount of penalties and attorney fees to award are matters within the trial court's discretion and subject to review only for an abuse of that discretion. *Sheehan*, 114 Wn. App. at 350-51 (noting that PDA "grants discretion to the trial court, not to this appellate court, to set the amount of the penalty within the minimum and maximum ranges"). *See also Lindberg v. Kitsap County*, 133 Wn.2d 729, 746, 948 P.2d 805 (1997) (*Lindberg* II); *Am. Civ. Liberties Union of Wash. v. Blaine Sch. Dist. No. 503*, 95 Wn. App. 106, 111, 975 P.2d 536 (1999) (*A.C.L.U.*).[1]

## STATUTORY PENALTIES

We first address whether the trial court abused its discretion in setting the amount of penalties. We hold that it did. Although we reject Yousoufian's argument that the trial court was required to impose a daily penalty for each record withheld, the trial court's findings of gross negligence and a lack of good faith by the county do not support the court's imposition of a minimum penalty of $5 per day.

### 1. Grouping of Records

The PDA states that where a person prevails in seeking disclosure of "any public record," the person is entitled to "an amount not less than five dollars and not to exceed one hundred dollars for each day that he was denied the right to inspect or copy said public record." RCW 42.17.340(4). Yousoufian argues that this provision, construed liberally,

---

[1] Yousoufian argues that we should review the trial court's findings of fact de novo. *See Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 252-53, 884 P.2d 592 (1994) (*PAWS*) (stating that where record consists solely of documentary evidence, appellate court is in as good position as trial court to weigh evidence). But Yousoufian does not ask us to weigh the evidence in the record; instead, he takes issue with conclusions the trial court drew from its unchallenged factual statements. Thus, the proper standard of review for the trial court's findings of fact is not at issue in this case. We do note, however, that principles of judicial economy and deference to the trial court militate against de novo review of factual issues, and we do not conduct a trial de novo every time the record consists solely of documentary evidence. *See In re Marriage of Stern*, 68 Wn. App. 922, 928-29, 846 P.2d 1387 (1993).

requires the trial court to award at least five dollars per day each record is withheld.

We disagree. Although we are required to construe the PDA liberally in favor of disclosure, we interpret statutes according to their plain meaning whenever possible, and our primary goal in interpreting a statute is to give effect to legislative intent. *In re Dependency of R.V.*, 113 Wn. App. 716, 720, 54 P.3d 716 (2002). The literal meaning of RCW 42.17.340(4) contemplates a penalty for each day a record request is unlawfully denied; the statute does not require the penalty to be multiplied by the number of records responsive to a single request.

Further, even a statute's apparent literal meaning will not be followed if such a reading results in "[u]nlikely, absurd or strained consequences . . . ." *State v. McDougal*, 120 Wn.2d 334, 350, 841 P.2d 1232 (1992) (citing *State v. Fjermestad*, 114 Wn.2d 828, 835, 791 P.2d 897 (1990)). As the trial court found, awarding even the minimum penalty for each document that was eventually found to be responsive to Yousoufian's broad record request would result in a penalty "totally out of proportion to the County's negligence, the harm done thereby, and any amount needed for deterrence."[2] Under Yousoufian's interpretation, agencies that acted in good faith but failed to respond adequately to broad requests for multiple documents would often pay higher penalties than agencies that refused to disclose a single document in bad faith. This does not comport with the principle that bad faith should be the primary determinant of the amount of penalty imposed. *See Amren v. City of Kalama*, 131 Wn.2d 25, 37-38, 929 P.2d 389 (1997); *A.C.L.U.*, 95 Wn. App. at 111.

We also note that the Supreme Court has implicitly rejected Yousoufian's argument on this point. The plaintiffs in *Lindberg* II also argued that the trial court should have imposed a per-document penalty, and Division Two of this court agreed. *See Lindberg v. Kitsap County*, 82 Wn. App.

---

[2] On appeal, Yousoufian calculates $948,465 as the minimum statutory penalty.

566, 575, 919 P.2d 89 (1996) (*Lindberg* I). The Supreme Court necessarily rejected that argument when it reversed the Court of Appeals, stating simply that the trial court's penalty award was within its discretion. *Lindberg* II, 133 Wn.2d at 746-47. *See also A.C.L.U.*, 95 Wn. App. at 115 (imposing penalty of $10 per day, not per record per day). The trial court did not abuse its discretion in failing to award a penalty within the statutory range for each document withheld.

■ Yousoufian also argues that this court should reverse because the trial court's grouping of the records was arbitrary. The trial court grouped the penalties into two categories: studies and the cost documentation supporting each study. The trial court identified 15 studies that Yousoufian claimed were responsive to his request. The trial court found four of these studies to be nonresponsive. The court further found that Yousoufian requested the cost documents related to the Conway study on May 30, 1997, but did not request the other cost documents until his attorney's December 8, 1997 letter. Yousoufian does not assign error to either of these findings. The trial court further separated the documents into categories based upon the day they were made available to Yousoufian. These categories were not arbitrary, but were based on reasonable criteria and provided the court with a middle ground between the extreme penalty requested by Yousoufian and the minimal penalty sought by the county. In fact, given our above conclusions, the trial court would have been within its discretion to simply award an amount within the statutory range for each day that each of Yousoufian's requests went unanswered.[3] Using these categories instead of assessing a per-document penalty was not an abuse of discretion.

2. Subtraction of Days from Penalty

■ Yousoufian also argues that the trial court erred when it subtracted 527 days from the calculation of penal-

---

[3] The county does not cross-appeal, so we need not determine whether the trial court's award of penalties based on document groupings was erroneous from the county's standpoint.

ties. After receiving the final communication from the county claiming to have none of the records he sought, Yousoufian waited 647 days before filing his lawsuit. According to Yousoufian's declaration, he spent "25 or more" hours discussing his case with different lawyers before one took his case. Yousoufian further stated that he was not able to find a lawyer until the summer of 1999, about one year after the last communication from the county. The trial court allowed 120 days as a reasonable amount of time for Yousoufian to find an attorney and subtracted the remainder from the penalty award. The trial court reasoned that allowing recovery for the entire 647 days would encourage plaintiffs to wait before filing suit in PDA claims, allowing statutory penalties to accrue in the meantime.

This approach was within the court's discretion. The trial court's desire to encourage plaintiffs to act quickly to enforce the PDA was a tenable basis for subtracting a number of days from the penalty period in this case. *See Doe I v. Wash. State Patrol*, 80 Wn. App. 296, 305, 908 P.2d 914 (1996) (allowing denial of penalties for delay attributable in part to plaintiff). To hold otherwise would encourage dilatory tactics by plaintiffs and would not serve the purposes of the PDA.

Yousoufian argues that the legislature provided the only cutoff of the daily minimum penalty when it set a five-year statute of limitations for violations of the PDA. *See* RCW 42.17.410. But the statute of limitations merely defines how long a party can wait before bringing a claim; it does not answer the question of whether a per diem penalty should continue to accrue no matter how long a plaintiff waits to file suit.

Although subtracting an arbitrary number of days from the penalty period might be an abuse of discretion in some cases, under the facts of this case, the court's decision was sustainable. The county's final letter to Yousoufian stated that the Department of Finance did not have records responsive to his request. After receiving that letter, Yousoufian did not inform the county that he thought more

records existed or that he intended to file suit. Although Yousoufian's frustration at that point was understandable, the county quite reasonably considered the matter resolved when Yousoufian's requests stopped. Further, although Yousoufian did not actually find an attorney for about one year, the court's use of a 120-day period as a reasonable amount of time is not so unreasonable as to be an abuse of discretion. We hold that the trial court did not abuse its discretion by subtracting 587 days from the penalty period.

3. Award of Minimum Penalty

██ Where records have been withheld in violation of the PDA, courts are required to impose statutory penalties regardless of the reason for the violation. *Sheehan*, 114 Wn. App. at 355 (trial court that finds PDA violation must award penalties). "Although penalties will be assessed independently of whether the agency acted in bad faith, a principal factor in setting a penalty is the presence or absence of the agency's good faith." *A.C.L.U.*, 95 Wn. App. at 111 (citing *Amren*, 131 Wn.2d at 37-38).

In *A.C.L.U.*, this court reversed because the trial court's finding that the defendant school district acted in good faith was not supported by the evidence. The school district had refused to mail requested records despite the American Civil Liberties Union's offer to pay for copies and mailing costs. This court found the district superintendent's letter refusing to send the copies to be "startling evidence" of improper motives:

> First, the Superintendent's letter was sent after the documents were mailed to the ACLU. Thus, the Superintendent clearly should have known that the ACLU's request asked the District for only 13 pages, not[, as stated in the letter,] "thousands of pages." Second, not wanting to expend employee time copying the records is not a valid reason for denying the ACLU's request because the act requires state agencies to make the documents available and prohibits them from charging for locating public documents and making them available for copying. . . .
>
> . . . .

Third, the Superintendent also stated that the District was reluctant to spend taxpayer money to assist the ACLU in preparing their case against the District. This clearly is contrary to the act's policy that "free and open examination of public records is in the public interest, even though such examination may cause inconvenience or embarrassment to public officials or others."

*A.C.L.U.*, 95 Wn. App. at 113-14.

In *Amren*, the Supreme Court remanded for a finding of whether an agency acted in bad faith, noting that Amren had made "compelling" arguments suggesting bad faith. *Amren*, 131 Wn.2d at 38. Amren alleged that the city continued to rely on statutory exclusions that it knew did not apply, based on earlier consultations with the attorney general. Amren also alleged that the mayor had a conflict of interest that affected his decision of whether to disclose a report. *Amren*, 131 Wn.2d at 38 n.11.

▮ Yousoufian argues that the evidence of bad faith in this case is equally compelling as in the above cases. Certainly, there are elements of those cases in the record here. For example, county employees, like the school superintendent in *A.C.L.U.*, indicated that the county was spending hours of employee time and going out of its way to help Yousoufian when, in fact, the county was not adequately responding to Yousoufian's request. More disturbing is the response of the finance department to Yousoufian's records request. Yousoufian's attorney requested financial records from finance after the deputy prosecutor representing Sims' office indicated that a separate records request should be sent there. The same prosecuting attorney responded to Yousoufian's request with a letter indicating that finance had no records responsive to Yousoufian's request. Over two years later, after the lawsuit had been filed, Pat Steel was asked to find the same records and found that finance was unable to conduct a search by subject, but could search only by the name of the contractor. She was able to locate records within the department by getting a list of archived records from the archive department. It is hard to conceive of how

finance could have conducted a good faith search for the records requested while searching only by contractor name. The response Yousoufian received from finance, therefore, raises a strong inference that the department conducted a search that it knew was inadequate to address Yousoufian's request. As the trial court found, such a response is not a good faith effort.

But in both *A.C.L.U.* and *Amren,* some evidence indicated that the government agency knew it had responsive records that should have been disclosed, but purposely failed to disclose them. Here, the factual and legal misrepresentations the county made were grossly negligent, but it does not appear they were intentional. An inference of intentional nondisclosure might arise if one or more of the documents finally disclosed was in fact a "smoking gun," but Yousoufian has not identified any such document and none is apparent from our review of the record on appeal. In the final analysis, it seems clear that the county's violation of the PDA was due to poor training, failed communication, and bureaucratic ineptitude rather than a desire to hide some dark secret contained within its files. We therefore agree with the trial court's characterization of the county's conduct as grossly negligent, but not intentional, withholding of public records.

The question, then, is whether, based on those findings, the trial court's penalty award may be sustained. As noted above, the trial court has broad discretion to determine the appropriate penalties to impose for violations of the PDA, and we will not reverse its decision unless that discretion has been abused. A trial court abuses its discretion when its decision is manifestly unreasonable or lacks a tenable basis. *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Although we afford great deference to the trial court in this matter, we are convinced that the trial court's award of the minimum statutory penalty must be reversed. While the trial court stopped short of finding bad faith in the sense of intentional nondisclosure, the court's findings reflected

strong disapproval with what the court saw as gross negligence by the county in responding to Yousoufian's public records request. Those findings do not support the court's imposition of a minimum penalty of $5 per day.[4] The minimum statutory penalty should be reserved for instances of less egregious agency conduct, such as those instances in which the agency has acted in good faith but, through an understandable misinterpretation of the PDA or failure to locate records, has failed to respond adequately. *See, e.g., Sheehan*, 114 Wn. App. at 356-57.

 Further, we hold that the size of an attorney fee award is not a tenable basis on which to award a minimum penalty where a higher penalty would otherwise be appropriate. The trial court selected a rate of $5 per day "because the Court finds that the combined total of penalty and attorney fees is sufficient to deter future similar inappropriate conduct." It is true that the attorney fees awarded in this case, at $82,196.16, likely had an incidental deterrent effect. But it was the county's lack of response that caused those high fees. Further, the compensatory purpose of attorney fee awards is separate and distinct from the punitive purpose of statutory penalties. Accordingly, in order to effectuate the strong public policy in favor of public disclosure, courts should not justify a low penalty award on the basis of a high attorney fee award. RCW 42.17.251. *See also PAWS*, 125 Wn.2d at 272 (encouraging "strict enforcement" of fees and fines to deter improper denial of access to records). To the extent that the trial court's minimum penalty award was based on the amount of attorney fees, it rested on an untenable basis and was therefore an abuse of discretion.

---

[4] At oral argument, the county argued that the trial court did not actually impose the minimum penalty because it imposed a penalty for each group of records withheld rather than simply imposing a penalty for each day each records request went unanswered. But the county has not filed a cross-appeal or assigned error to the trial court's method of calculation. Further, the trial court based its award of the minimum penalty on the amount of attorney fees, not on its grouping of the records into categories. Thus, the issue before us is whether a minimum statutory penalty is sustainable.

We therefore remand the case to the trial court for imposition of penalties in an amount that exceeds the statutory minimum of $5 per day.[5] It shall be for the trial court to determine where within the statutory range that penalty should fall, and we note that the trial court has broad discretion in setting an amount above the statutory minimum. But under the facts of this case, a statutory minimum penalty cannot be sustained.

## ATTORNEY FEES

 Yousoufian also argues that the trial court erred in calculating his reasonable attorney fees. The trial court did not award all of Yousoufian's requested attorney fees, but instead made deductions on several bases. Because the trial court had tenable bases for every deduction it made, we hold that the trial court's fee award was not an abuse of discretion.

 There is no dispute that Yousoufian was the prevailing party and was therefore entitled to "all costs, including reasonable attorney fees . . . ." RCW 42.17.340(4). This provision, like the rest of the PDA, is to be "liberally construed to promote full access to public records." *Coalition on Gov't Spying v. King County Dep't of Pub. Safety*, 59 Wn. App. 856, 862, 801 P.2d 1009 (1990); RCW 42-.17.010(11). Nevertheless, by inserting the word "reasonable" into the statute, the legislature clearly intended that the trial court have discretion to decline to award fees that are deemed unreasonable, and we will not overturn a fee award absent a showing that the trial court abused that discretion. *Lindberg* II, 133 Wn.2d at 747.

---

[5] Yousoufian asks this court to set the amount of penalties on appeal. Although we followed that procedure in *A.C.L.U.*, we did so because the case had already been remanded to the trial court once and was being reversed on a second appeal. As we noted in *A.C.L.U.*, "the usual procedure is to remand to the trial court for a determination of an appropriate penalty . . . ." *A.C.L.U*, 95 Wn. App. at 114. Moreover, we have recently reaffirmed the principle that the PDA gives discretion to the trial court, not to this court, to assess penalties under the PDA. *See Sheehan*, 114 Wn. App. at 350. Accordingly, we remand to the trial court for determination of an appropriate daily penalty above the statutory minimum.

■■ ■ In *Bowers v. Transamerica Title Insurance Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983), the Washington Supreme Court adopted the lodestar method of calculating reasonable attorney fees. *See Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973). Under that method of calculation, the court first determines the number of hours reasonably expended on the litigation. In doing so, the court should discount hours spent on "unsuccessful claims, duplicated effort, or otherwise unproductive time." *Bowers*, 100 Wn.2d at 597.

Yousoufian argues that the court's "minimal" award of attorney fees will discourage attorneys from taking PDA cases in the future. This argument is supported in part by Yousoufian's declaration, which indicates that he spoke with several attorneys before he found one who was willing to take his case.

But reviewing the trial court's attorney fee award under an abuse of discretion standard, it is apparent that the court had tenable bases for all the deductions it made. The trial court determined the amount of fees to award based on "those reasonably necessary to secure the release of the relevant documents." In particular, the trial court subtracted fees that were charged for unsuccessful motions, duplicative time spent by two or more attorneys on the same task, excessive research on collateral issues, time spent locating alternative counsel, and meetings with citizen activists. The court also found that the discovery conducted in an attempt to locate a "smoking gun" document that had not been disclosed was reasonable up to a point. Nevertheless, the court reduced the final amount authorized for one attorney by 10 percent because the court determined that he conducted discovery "long after it should have been apparent that lack of diligence, not evil intent, was the cause of the problems." Finally, the trial court reduced the total amount of attorney fees by 20 percent based on a variety of "other considerations," including the lack of clarity in counsel's presentation to the court, the overall excessiveness of the amount of fees expended,

and the fact that the majority of the fees were incurred after the disclosure had been made. These are all tenable bases for the court's deductions. The trial court's fee award, therefore, was not an abuse of discretion.

## ADDITIONAL RECORDS

Yousoufian further argues that additional records remain that have not been disclosed, and he asks this court to reverse and remand for further disclosure.[6] At trial, Yousoufian submitted a list with a number of suspected documents and his reason for suspecting that King County possessed them. The trial court found that "as of trial, a reasonable disclosure of documents has now been made. Any miscellaneous documents not yet produced are non-responsive not warranting either a finding or a fine." As Yousoufian points out, the PDA requires that agencies make available "*all* public records" that do not fall within specific exemptions, not just a reasonable number of records. RCW 42.17.260(1) (emphasis added). But the trial court's use of that term must be read in conjunction with the trial court's finding that any further records were nonresponsive. In other words, the trial court did not merely find that the county's disclosure was "reasonable," but also found that it was complete. Yousoufian has not explained how any remaining records pertain to his record requests, and after reviewing the record, we agree with the trial court that the records identified by Yousoufian appear to be unresponsive. Viewing the record as it was presented to the trial court, we can find no error in its finding that, as of trial, the county had responded completely to Yousoufian's requests.[7]

---

[6] The parties agree that our review of this issue is de novo.

[7] Shortly before oral argument, Yousoufian filed a motion asking this court to consider additional evidence on appeal. Because we conclude that the requirements of RAP 9.11 have not been met, we deny Yousoufian's motion. Any additional arguments in this regard should be addressed to the trial court on remand, although we note that the documents attached to Yousoufian's motion do not appear to be responsive to his original records request.

## CONCLUSION

We affirm the trial court's award of attorney fees and its finding that the county's response was complete as of trial. We reverse the trial court's penalty award and remand to the trial court for determination of an appropriate penalty above the statutory minimum. On remand, the trial court shall also award Yousoufian reasonable attorney fees for this appeal.[8]

APPELWICK and SCHINDLER, JJ., concur.

Review granted at 150 Wn.2d 1001 (2003).

---

[8] Yousoufian also argues that this court should remand for determination of whether King County has changed its handling of PDA requests. This question is not properly before this court because it is beyond the scope of the trial court's decision and outside the record on appeal. RAP 2.4(a).