937 P.2d 1119 (1997)
86 Wash.App. 521
WASHINGTON STATE DEPARTMENT OF CORRECTIONS, a state agency, Appellant,
v.
CITY OF KENNEWICK, a political subdivision of the State of Washington; Barry Blondheim and James Kilgore and Marilyn Kilgore, husband and wife, Respondents.
No. 15355-0-III.
Court of Appeals of Washington, Division 3, Panel Four.
May 22, 1997.
As Amended on Denial of Reconsideration June 26, 1997.
*1121 Thomas J. Young, Assistant Attorney General, Corrections Division, Olympia, for Appellant.
William L. Cameron, City Attorney, City of Kennewick and Brian J. Iller, Rettig, Osborne, Forgette, O'Donnell & Iller, Kennewick, for Respondents.
*1120 SCHULTHEIS, Judge.
Neighboring property owners opposed the Department of Corrections' (DOC) application for a conditional use permit for a work release facility in downtown Kennewick. They feared the facility would increase the incidence of crime in the area and decrease their properties' value. In this appeal, we are asked to decide whether the Kennewick Planning Director, in granting DOC the permit, properly rejected those fears as unsubstantiated. We hold he did. We also uphold, as supported by substantial evidence, his findings the facility will not be a detriment to uses conducted on surrounding property. We reverse the superior court's judgment to the contrary and remand to the City of Kennewick with directions to grant DOC's application for a conditional use permit.
In 1992, DOC appointed a Work Release Siting Committee to identify potential sites for a work release facility in the Tri-Cities. The committee included representatives from Kennewick, Richland and Pasco. It recommended that the cities and DOC negotiate criteria for picking the site and for selecting inmates to be housed in the proposed facility. A document titled "Interlocal Cooperation Agreement" was signed by the cities and DOC in September 1992.
The agreement provided that the committee would supply each city a list of qualified sites within its jurisdiction. From the list, each city would nominate one site. A "neutral expert" would then select a site for the work release facility from those nominated by the three cities. The agreement placed responsibility on DOC to "interact[ ] with the property owners, business persons, and residents who live near the selected site to secure public acceptance of the proposed Facility." Under the terms of the agreement, the facility would have no more than 40 beds. A local screening committee would review an offender's history before DOC sent him to the facility, and its determination on placement would be final.
The criteria for inmate placement included a provision that the facility would house "only those offenders with significant social, economic, or family ties within the Benton and Franklin counties community...." The criteria excluded from placement offenders whose crime victim was particularly vulnerable, such as a child or an elderly person. The criteria also excluded class A sex offenders, and offenders who had committed any sex offense and who had a prior sex offense or violent offense.
Irv Berteig, a land use hearing examiner and former King County Planning Director, *1122 served as the "neutral expert" the agreement provided would make the final site selection. He selected the East Bruneau site in downtown Kennewick for location of the work release facility. DOC then applied to the City of Kennewick for a conditional use permit.
Under Kennewick's Municipal Code (KMC), section 18.80.020(A), the city planning director has the authority to approve all land use permits. The code also establishes a framework for the planning director's decision. In the case of applications for conditional use permits, the code states the director will issue the permit only if the use will not be materially detrimental to the public welfare or injurious to property or improvements in the vicinity. KMC 18.80.110(d)(1). KMC 18.75.330 applies when a governmental body seeks a conditional use permit for a penal institution, and the site is within one-quarter mile of a residential zone, any facility that serves children, or any facility that serves the elderly. In such situations, the code requires the planning director to make specific findings justifying the location, and to find the location is not detrimental to those uses before granting a permit. KMC 18.75.330.
In September 1993, the Kennewick Planning Director conducted a public hearing on DOC's application for a conditional use permit. At the hearing, DOC's position was presented in part by Mr. Berteig, the neutral expert. Mr. Berteig stated that locating the facility at the Kennewick East Bruneau site would not be disruptive to the surrounding commercial and industrial area, and that it was the best location in terms of the proximity of employment opportunities for inmates. In his written report, he recognized the existence of nearby residences and that "[t]he logical walk between the facility and the nearest bus stop would pass through [this] cluster of ... rental houses." He recognized, as well, that school bus stops exist in the immediate vicinity, and suggested working with the school district "to identify bus stop conflicts." Mr. Berteig stated there were no other facilities in the area serving vulnerable populations.
An attorney representing nearby residents and business owners who opposed building the work release facility at the East Bruneau address offered a report by Sumner Sharpe, also an expert in city planning and land use. Mr. Sharpe's report pointed out the public perceives work release facilities as increasing the risk of crime and adversely affecting residents, business owners, and business invitees.
The attorney for the site opponents stated Mr. Berteig ignored the fact that services and businesses for children and the elderly exist near the site of the proposed facility. One business, the Cable Greens Mini Golf Course, serves those populations and is located within one-quarter mile of the proposed site. Other businesses and services close to the work release site are the Elder Day-Care Center on Washington Street, one-half mile from the site; the Volunteer Center in the same building as the Elder Day-Care Center; and the Lampson Building, which houses senior services and is just outside the one-quarter mile radius. There are two school bus stops within two blocks of the proposed site, three more within one-half mile, and seven more within a mile. Layton Park and Keewadin Park, the location of the Kennewick Senior Citizens' Center, are within one mile. The 1990 Interim Comprehensive Plan for Kennewick provides for a medium density residential zone within 1,000 feet of the site.
In response, DOC offered crime statistics from 1987 through 1992 for a 15-bed work release facility in Pasco. The failure to return rate for inmates at that facility ranged from 4 percent to 11 percent per year. Lane Merryman was the supervisor of the Pasco work release facility for 14 years. He stated that the facility opened in 1972. It has since housed approximately 1,100 offenders. Sixty-eight percent of these completed the program. Twenty-three percent were terminated; i.e., they were returned to the institution for some sort of violationsome technical, others serious. Seven percent failed to return to the facility. Less than one percent of the total inmates committed new felonies while assigned to the facility.
*1123 DOC also relied on a memo from the American Planning Association and on an information brief from the United States Department of Justice. The memo stated that fears about correctional institutions are often based upon perceptions, not reality. Property values might decrease over the short term but rebound after initial fears are dispelled. The memo cited a 1985 study of Florida institutions that found that 94 percent of escaped inmates over a two-year period were recaptured, only four crimes committed by inmates had been reported since 1976, and most of them were automobile thefts. In another study, researchers found that escapees sometimes stole automobiles but did not commit violent crimes. The information brief provided an overview of a 1987 study that found that correctional facilities have no negative effects on property values, public safety, or the quality of life. DOC also relied upon Mr. Berteig's testimony regarding a study of six Washington prison communities. With regard to property value, the study concluded that "if there were a stigma attached to prison communities, it was not reflected in prices or economic behavior."
The planning director concluded DOC made a "concerted effort" to educate the public about work release and the Kennewick site. But, the director recognized there remained a lack of understanding and a "perceived" fear that a wrong type of inmate might be housed in the work release facility. Nevertheless, he believed the facility could operate successfully in the urban setting. He gave as examples the Pasco facility and another at the Justice Center, which have not caused any "apparent problems" for the public. The director stated "no verified evidence" had been presented to substantiate the perception of increased crime and a resulting negative impact on property values.
The director concluded the proposed site, with two exceptions, conformed to the municipal code's provision that a penal institution be more than a quarter mile from any facility that serves children, and any facility that serves the elderly. KMC 18.75.330. Those exceptions are the miniature golf course and two of the school bus stops. As required by KMC 18.75.330, the planning director entered specific findings justifying the proximity of the work release facility to these uses. He found the miniature golf business is located in an area that has the potential of being surrounded by other commercial/industrial uses. More businesses mean more workers and more visits by the public, lending security in numbers. Also, the golf course is separated from the site by Columbia Drive, a busy street that provides a natural barrier to pedestrian traffic. The planning director found the facility's impact on children at the school bus stops would be minimal because the presence of rail and truck traffic "lead[s] one to hope parents or guardians [already] are in attendance at the bus stops for children safety."[1]
In addition, the director found there was a residential area with 13 houses in the vicinity of the proposed site. Three of the houses presently lack water service. Since Kennewick's *1124 Interim Comprehensive Plan zones this area light industrial, the director concluded the 13 residential units are transitional; i.e., existing only until there is an offer to develop the property for a use consistent with the zoning.
Finally, the director observed that the interlocal agreement provided that a local screening committee would have a veto right on whom DOC accepted into the work release facility. The planning director believed this screening process indicated "all possible steps have been taken to make the facility as safe as possible." Based on these findings, the planning director approved DOC's application for a conditional use permit for the facility.
Several neighborhood property owners appealed the director's decision to the Kennewick Planning Commission. KMC 18.80.070. The planning commission reversed the director, on the ground his findings were insufficient to conclude the work release facility would not be a detriment to the residential zone, the miniature golf course and the two school bus stops. DOC then appealed to the Kennewick City Council. The council agreed with the commission. It also held it could not disregard neighborhood property owners' and business customers' fear of increased crime in the area. It stated: "[W]here the fear of a public institution is real and will in the light of common experience result in a reduction in property values and the lessening of an owner's right to the comfortable and quiet enjoyment of his property, that institution is `materially detrimental' to the surrounding property."
DOC sought review in superior court on a writ of certiorari, pursuant to RCW 7.16.070. The City of Kennewick moved to dismiss. It argued DOC had not joined nearby property owners as necessary parties under CR 19(b). The court denied the motion, but allowed owners Barry Blondheim and James and Marilyn Kilgore to intervene.
The superior court reviewed the planning director's specific findings and agreed with the planning commission and the city council they did not support the conclusion the use was not detrimental to services and facilities for children and the elderly. The court was critical of the director's findings that the facility is "as safe as possible" and that other facilities have presented "no apparent problems." It held: "`[A]s safe as possible' has no meaning. It could be either very good or very bad. The `no apparent problems' is also ambiguous without a finding as to how similar or dissimilar the [comparison] facilities are to the proposed one." The court therefore agreed the planning director's decision had to be reversed. But, the court rejected the city council's other basis for reversing the planning director; i.e., public fear crime would increase in the neighborhood. The court at page nine of its memorandum decision said it was persuaded by DOC's argument that if fear and community displeasure are allowed to be used to deny permits for essential services, such facilities could simply never be built.
DOC now appeals to this court.

PRELIMINARY ISSUES
Under RCW 7.16.120(5), a petition for writ of certiorari of a decision by an executive officer or body calls for the court to review "[w]hether the factual determinations [of such officer or body] were supported by substantial evidence." The substantial evidence test requires the reviewing court to accept the fact finder's views regarding witness credibility and the weight to be given competing inferences. Freeburg v. City of Seattle, 71 Wash.App. 367, 372, 859 P.2d 610 (1993). In this appeal, the parties disagree as to whose findings the court reviews for substantial evidence: Is it the findings of (1) the city council, (2) the planning commission, or (3) the planning director?
Former RCW 35A.63.170 provided "the legislative body [of a city] may vest in a hearing examiner the power to hear and decide applications for conditional uses...." "Each city legislative body electing to use a hearing examiner pursuant to this section shall by ordinance specify the legal effect of the decisions made by the examiner." RCW 35A.63.170. The legal effect "shall include one of the following: (1) The decision may be given the effect of a recommendation to the legislative body; [or] (2) The decision may be *1125 given the effect of an administrative decision appealable within a specified time limit to the legislative body." Former RCW 35A.63.170.[2]
Kennewick has elected to have a hearing examiner, in the person of the planning director, hear and decide applications for conditional use permits. The Kennewick Municipal Code provides that all land use permits are to be approved or denied by the planning director. KMC 18.80.020(A). The planning director makes appropriate findings, KMC 18.80.030, and any person aggrieved by the director's action "may appeal to the Planning Commission within seven days...." KMC 18.80.070. Further, "[a]ny person aggrieved by an action of the Planning Commission may appeal to the City Council within seven days...." KMC 18.80.070. These provisions indicate the codifiers intended the planning director's decision be more than a recommendation, and have the effect of an administrative decision, as set forth in RCW 35A.63.170.
Here, the fact finder was the planning director. We apply the substantial evidence test to the director's findings, not to those of the planning commission or the city council.
The City of Kennewick and the intervenors raise another preliminary issue. They contend the superior court should have dismissed the petition for writ of certiorari because DOC failed to join the intervenors as necessary parties. We hold the superior court correctly determined nearby property owners are not necessary parties. Under CR 19, "A person ... shall be joined as a party ... if ... he claims an interest relating to the subject of the action and is so situated that ... disposition ... in his absence may... impair or impede his ability to protect that interest...." A property owner who successfully seeks a zoning change for his property is a necessary party to an appeal of that change by neighboring landowners. See, e.g., Cathcart-Maltby-Clearview Community Council v. Snohomish County, 96 Wash.2d 201, 207, 634 P.2d 853 (1981). But neighboring landowners are not necessary parties to a property owner's appeal from an order denying his request for a zoning change. The Kennewick Municipal Code provides for notice to surrounding landowners of the time and place of a public hearing on an application for a conditional use permit. KMC 18.80.020(C). That notice is sufficient to protect those landowners' property interests. They may seek to intervene in any subsequent action to review a decision made by the planning director granting or denying the permit. See CR 24.

DOC'S APPEAL
DOC's appeal raises two issues, one legal and one factual. They are: (1) Is public perception that the work release facility creates a risk of crime to persons who live near the facility or who visit businesses in the area a legitimate basis for denying DOC a conditional use permit? And, (2) are the director's findings justifying the site location within one-quarter mile of the miniature golf business and two school bus stops supported by substantial evidence?
A. Public Fear.
The intervenors rely upon Ferry v. City of Seattle, 116 Wash. 648, 200 P. 336 (1921), rev'd on reh'g, 116 Wash. 648, 203 P. 40 (1922). There, property owners complained that a proposed reservoir would constitute a nuisance for the reason it would "constantly menace their lives and property." Id. at 662, 200 P. 336. The owners presented expert testimony the embankment containing the reservoir could fail and cause loss of life. The court held, "the question of the reasonableness of the apprehension turns ..., not only on the probable breaking of the reservoir, but the realization of the extent of the injury which would certainly ensue." Id. "`The question is, not whether the fear is founded in science, but whether it exists; not whether it is imaginary, but whether it is real....'" Id. at 665, 200 P. 336 (quoting Everett v. Paschall, 61 *1126 Wash. 47, 51, 111 P. 879 (1910)). Since the fear interfered with the owners' comfortable enjoyment of their properties, the court held the reservoir was a nuisance and ordered its construction enjoined. Id.
DOC points out that Ferry and Everett are nuisance cases, not zoning cases. The few Washington cases that have considered the relevance of community fears to zoning decisions have required that the fears be substantiated before the zoning authority may use them as a basis for its decision. In Sunderland Family Treatment Servs. v. City of Pasco, 127 Wash.2d 782, 903 P.2d 986 (1995), the Supreme Court reviewed the city's denial of a special use permit to Sunderland for a group home for troubled teens. Sunderland argued the city denied the permit due to unfounded fears the home would impair property values. The court distinguished between "well founded fears and those based on inaccurate stereotypes and popular prejudices." Sunderland, 127 Wash.2d at 794, 903 P.2d 986. The latter category does not justify zoning restrictions. Id. In Sunderland, there was no evidence that the home would have any effect on the safety of children or of the elderly in the area.
The Washington Court of Appeals has decided two cases concerning the effect of public fears of a proposed land use. In Maranatha Mining, Inc. v. Pierce County, 59 Wash. App. 795, 804, 801 P.2d 985 (1990), Division Two held the Pierce County Council acted arbitrarily and capriciously when it overruled its hearing examiner's findings that a permit should be issued to Maranatha Mining for its proposed surface gravel mine and asphalt plant. The court held: "The only opposing evidence was generalized complaints from displeased citizens. Community displeasure cannot be the basis of a permit denial." Maranatha Mining, 59 Wash.App. at 804, 801 P.2d 985 (citing Kenart & Assocs. v. Skagit County, 37 Wash.App. 295, 303, 680 P.2d 439, review denied, 101 Wash.2d 1021 (1984)). In Kenart, Division One reversed a planning decision denying approval of a planned unit development, stating it appeared the denial was solely the "result of community displeasure." Kenart, 37 Wash. App. at 303, 680 P.2d 439.
We hold there is a distinction between nuisance cases and zoning cases that prevents the decision maker from considering neighbors' general fears in deciding whether to grant an owner's application for a conditional use permit. The distinction is illustrated by a recent California decision, Lucas Valley Homeowners Ass'n, Inc. v. County of Marin, 233 Cal.App.3d 130, 284 Cal.Rptr. 427 (1991). Lucas concerned a conditional use permit issued on an application to convert a residence into a synagogue. The court held there was no evidence, only general allusions, the synagogue would affect property values. It observed: "Suffice it to say that whenever a noncommercial assembly use locates next door to a family home, there is a potential for some real or imagined impact on the value of that home." 284 Cal.Rptr. at 443. The court concluded: "The legislative determination that these uses are allowed by permit is tantamount to recognizing this phenomenon and, thus, the impact analysis should focus on the neighborhood as a whole and the welfare of all persons residing there." 284 Cal.Rptr. at 443.
Here, the Legislature recognized that the location of essential public facilities, including penal institutions, might encounter local opposition. It therefore enacted RCW 36.70A.200(2), which provides that no local comprehensive plan or development regulation may preclude the siting of such facilities. We infer from RCW 36.70A.200(2) that neighborhood fears that are not substantiated are not relevant. What is relevant is the impact the facility will have on neighborhood safety. That is why the Kennewick Municipal Code requires the director to make specific findings a penal institution is not detrimental to residents or to facilities for children and the elderly that are located within one-quarter mile of the proposed site for the institution. The fears here are "generalized," as they were in Maranatha, and do not differ from those the existence of a penal institution engenders in any neighborhood. *1127 Such fears are not relevant to the consideration of DOC's application for a conditional use permit.
B. Adequacy of the Director's Specific Findings.
As set forth above, KMC 18.75.330 required the planning director, before granting the permit, to (1) issue specific findings to justify siting the work release facility within one-quarter mile of facilities used by children and/or the elderly, and (2) find the location was not detrimental to those uses.
In deciding a petition for writ of certiorari, the superior court reviews the administrative decision maker's findings to determine whether they are supported by substantial evidence. RCW 7.16.120(4)-(5). The review is deferential. Sunderland, 127 Wash.2d at 788, 903 P.2d 986. It "requires the court to view the evidence and reasonable inferences therefrom in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority"in this case, the planning director. Id.
Here, the director found that the work release facility would have a minimal impact upon the miniature golf business and upon the safety of children at the bus stops and residents of the nearby houses. He relied upon evidence relevant to the individual uses and upon the fact DOC had agreed not to place more dangerous-type inmates at the facility. With respect to the miniature golf business, the director pointed out it was located some 300 to 350 yards from the proposed work release site, across Columbia Way, a busy arterial. He also noted the fact the zoning for the area surrounding the golf business permits commercial/industrial-type uses. Once the area is fully developed, other businesses will further insulate the golf business from the work release facility. We hold these facts constitute substantial evidence in support of the director's finding the location of the facility within one-quarter mile of the miniature golf business is justified.
With respect to the school bus stops, the director observed these locations already expose children to the dangers of railroad and truck traffic. By itself, this fact cannot justify adding the work release facility as another danger. However, the number of school bus stops is not great. Only two exist within a quarter-mile of the site; another three are within one-half mile. As suggested by Mr. Berteig, the low number of stops makes it possible for officials from the school district and the work release facility to devise a plan that separates the comings and goings of the inmates and the children. We therefore hold the director's finding justifying placement of the facility in the neighborhood of the bus stops is supported by substantial evidence.
Finally, we review the director's finding regarding the 13 residential units near the facility. The director cited the fact those residences are in an area that Kennewick's Interim Comprehensive Plan indicates as light industrial. The City has pulled water meters from two of the residences, and a third has no utility record at all. The inference is that those residences are vacant. The director found the residential area was "transitional," meaning the area will remain residential only until the owners receive offers from purchasers who seek to develop it more profitably for light industrial uses. Again, we hold the director's finding justifying the site within one-quarter mile of the residences is supported by substantial evidence.
We therefore reverse the holding of the superior court that the director's findings do not fulfill the requirements of KMC 18.75.330. We remand to the City of Kennewick with directions to grant DOC's application for a conditional use permit.[3]
SWEENEY, C.J, and THOMPSON, J., concur.
NOTES
[1] The director's findings are as follows:

"The miniature golf course is 300 to 350 yards from the proposed site ... In regard to 18.75.330(b)(2), justifications for approving the proposed work release site are as follows:
"1. The site is in an area that is presently relatively isolated, but has the potential for being surrounded by commercial/industrial-type uses which will provide a means for security because of workers, and built-in security systems....
"2. The presence of E. Columbia Drive may act as a barrier to pedestrian movement to the course....
"Although KMC 18.75.330(b)(2) does not list school bus stops as an area of concern, the question of children safety at these bus stops has been raised ... [T]here are seven stops within one-half mile of the site.... [T]he presence of the railroad and the type of traffic in the area trucks, commercial vehicles and the likewould lead one to hope parents or guardians are in attendance at the bus stops for children safety....
"9.... [T]here is a residential area in the vicinity of the proposed site.... [T]here are 13 residential units to the northeast of the site.... [T]wo are vacant since the water meters have been pulled, and one has no utility record. This residential area is indicated as Light Industrial on the Interim Comprehensive Plan, and is zoned `IL' (Industrial, Light). Accordingly, it would appear that these residential units could be in an area of `transition'being used as residential until there is an offer to develop the property with a use consistent with the zoning designation."
[2] RCW 35.63.130 was amended by Laws of 1994, ch. 257, § 7.
[3] Alternatively, the intervenors urge us to reverse the planning director's decision as made upon unlawful procedures. The intervenors unsuccessfully made the same argument to the superior court. They have not cross-appealed. In any event, the reasoning of the superior court in rejecting their argument is persuasive. We also refuse to reverse the director's decision on this basis.

Given our holding in DOC's favor, we need not address DOC's argument the city council's consideration of its appeal violated the appearance of fairness doctrine.