72 P.3d 206 (2003)
117 Wash.App. 411
CITIZENS FOR FAIR SHARE, a nonprofit corporation, Appellant,
v.
STATE of Washington DEPARTMENT OF CORRECTIONS, Joseph Lehman, Secretary, Jim Blodgett, Regional Administrator, Respondents.
No. 28138-4-II.
Court of Appeals of Washington, Division 2.
July 1, 2003.
*209 Richard D. Brady, Brady & McLean, PLLC, Tacoma, Brian Patrick McLean, Law Office of Brian P. McLean, Kent, for Appellant.
Deborah L. Cade, Olympia, for Respondents. *207
*208 HUNT, C.J.
Citizens for Fair Share (Citizens) appeal the trial court's denial of injunctive relief and its grant of summary judgment to the Department of Corrections in Citizens' action against the Department for siting a Community Justice Center (CJCenter) in Tacoma's Center Street Neighborhood. Citizens argue that (1) the CJCenter is a "community-based facility" for which RCW 72.65.220 requires notice and a hearing prior to a siting decision; (2) the Due Process Clause[1] requires public hearings, like treatment of similarly situated neighborhoods, and action that is not arbitrary and capricious; (3) the Offender Accountability Act applies to the CJCenter and requires both community risk assessments and deployment of correctional officers where offenders are located; and (4) the Department failed to comply with Citizens' public disclosure requests under the Public Disclosure Act (PDA).[2]
We hold that (1) the CJCenter is not a "community-based facility" under RCW 72.65.220, which applies only to correctional facilities with residential components; (2) neither statute nor due process requires neighborhood notice and public hearing before the Department selects a specific CJCenter site; (3) equal protection is inapplicable to this CJCenter siting; and (4) the Department properly complied with all public disclosure requests except for its failure to state why it was not providing offenders' addresses. Accordingly, we affirm the trial court's denial of injunctive relief to Citizens and its grant of summary judgment to the Department on all claims, except for Citizens' claim that the Department failed to provide a reason for nondisclosure of offender addresses. As to this latter claim, we reverse summary judgment and remand to the trial court.

FACTS
In July 2000, the Department decided to establish a Community Justice Center in Tacoma to provide office and other space for (1) supervision of and reporting by 150 to 200 *210 community-supervised offenders;[3] (2) other DOC office functions; (3) statewide and King/Pierce County regional personnel and staff-training programs, including a safety training center with a bullet-less firing range; (4) housing statewide hearings records; and (5) community service staff, vehicles, and equipment. The CJCenter's services to offenders would include chemical dependency assessments, urinalyses, training, offender hearings, data collection, counseling, mental health referrals, transportation to and from work sites, and assignment to work crews.
Citizens object to the Center Street site because it is within one-half mile of at least three schools, 50 licensed day care facilities, a state methadone clinic, an adult residential drug treatment facility, an alcohol treatment center, two women's shelters, the Tacoma Rescue mission, and several homeless outreach programs. Citizens' experts testified that the neighborhood appears "at risk" because it has low income levels; high numbers of transients; high crime rates; and a disproportionately high number of social service clients, including drug abusers, mentally ill persons, homeless persons, and criminals.

I. SITING
The Center Street site was not the Department's first choice for the Tacoma CJCenter. The Department first considered an 8,000 square foot site on Martin Luther King, Jr. Way and a 10,000 square foot site on Tacoma Avenue South. The Department mailed notices and held meetings with various community groups concerned about siting the CJCenter at these two locations. But in 2000, the Tacoma City Council established a moratorium through March 2002 prohibiting siting Department facilities or offices in "narc zones," such as the Martin Luther King, Jr. Way and Tacoma Avenue South sites.[4]
Citizens claim that (1) a group opposed to these two sitings and an affiliated individual, Michael Hargreaves, offered to locate a new site in Tacoma's Center Street Neighborhood; and (2) Hargreaves showed the Department a 30,000 square foot site at 1015 Center Street, secured an option to purchase that building, and then bid the site to the Department. Citizens complain that the Department did not conduct hearings and collaborative meetings with them, as it had done for the other possible sites, before choosing their Center Street neighborhood as the site for new the CJCenter.
The Department counters that it met with many groups and individuals before selecting the Center Street site, and made repeated offers to meet with Citizens, which Citizens declined. In reaching its final siting decision, the Department used the Washington Department of General Administration (GA) and its leasing policy, published a general solicitation for a 30,000 foot space, received several bids, evaluated four bids with GA, accepted Hargreaves' bid for the 1015 Center Street site, and then executed a formal lease with Hargreaves. The Department asserts that its selection process was fair and prudent.

II. PUBLIC DISCLOSURE
On July 31, Citizens submitted a public disclosure request to the Department, asking for offenders' addresses, addresses of current reporting facilities, Department policies for managing political opposition to siting of correctional facilities, and the effect of a CJCenter on crime rates and property values. That same day, the Department acknowledged the request and stated that it would answer within fifteen business days.
On August 17, the Department provided Citizens with (1) a list of 163 offenders who would be required to report to the CJCenter, (2) their zip codes, (3) departmental policies on site selection, and (4) a list of all reporting *211 facilities in Pierce County. The Department did not provide the requested offender addresses, nor did it claim that this information was exempt from disclosure.

III. LAWSUIT
Citizens sued the Department, requesting declaratory relief and alleging violations of the Offender Accountability Act,[5] competitive bidding laws,[6] federal civil rights,[7] the Public Disclosure Act,[8] due process,[9] and Washington's Administrative Procedure Act (APA).[10] The trial court denied Citizens' motion for a preliminary injunction and their claims relating to the Offender Accountability Act.
The Department moved for summary judgment. The trial court granted the motion and dismissed Citizens' claims. Citizens appeal the order denying injunctive relief and summarily dismissing its Offender Accountability Act, Public Disclosure Act, and due process claims.[11]

ANALYSIS

I. STANDARD OF REVIEW
Summary judgment is appropriate "if the pleadings ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). We review summary judgment de novo, viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. Allstate Ins. Co. v. Raynor, 143 Wash.2d 469, 475, 21 P.3d 707 (2001). If reasonable minds can reach different conclusions, summary judgment is improper. Kalmas v. Wagner, 133 Wash.2d 210, 215, 943 P.2d 1369 (1997).

II. DUE PROCESS
Citizens assert a 42 U.S.C. § 1983 claim, arguing that the Department violated their right to due process. Minimum constitutional due process is determined by considering three factors:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used ...; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

A. Adequacy of Complaint
The Department initially responds that Citizens insufficiently pleaded this claim because they failed to identify a person acting under color of state law and failed to allege a right that was violated. The Department lost a similar argument in Dean v. Lehman, 143 Wash.2d 12, 33-34, n. 9, 18 P.3d 523 (2001), in which the Supreme Court found a "sufficient basis" for an imprecise complaint under our "notice pleading" system.
Citizens reply that their complaint adequately gave the Department notice of the general nature of their claimthat the Department deprived them of "rights, privileges, and immunities" under the State and U.S. constitutionsbecause other parts of their complaint cite specific constitutional rights, including violations of due process based on liberty and property interests, safety, and arbitrary and capricious action. We agree. Citizens have a private interest in their "safety." See Youngberg v. Romeo, 457 U.S. 307, 315-16, 319, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).
Citizens' complaint gave at least as much notice of a § 1983 claim based on due process *212 as Dean did. Thus, we consider the merits of Citizens' § 1983 due process claim.

B. Notice and Public Hearing
Citizens argue that the Department must comply with RCW 72.65.220 and provide notice and public hearings before siting a CJCenter because (1) the CJCenter is a "community based facility"; and (2) the Department's past RCW 72.65.220 compliance for CJCenter sitings requires the Department to follow the same policy for this CJCenter siting.[12]

1. "Community-based facility"
We first address whether the CJCenter is a "community-based facility," for which RCW 72.65.220(1) requires notice and public hearing. RCW 72.65.220(1) provides:
The department or a private or public entity under contract with the department may establish or relocate for the operation of a work release or other community-based facility only after public notifications and local public meetings have been completed consistent with this section.
The Department contends that the statute applies (1) only to work-release facilities and other facilities with residential components, such as prerelease facilities; and (2) not to a facility such as the CJCenter, which is non-residential and predominantly administrative office, meeting, storage, and training space. Citizens argue that if the Legislature intended that RCW 72.65.220(1) apply only to work-release facilities, it would not have included the words "or other community-based facility" after the words "work release."
We conclude that the RCW 72.65.220 term "community-based facility" is ambiguous because it is susceptible to more than one reasonable interpretation. Fed'n of State Employees v. State Personnel Bd., 54 Wash.App. 305, 309, 773 P.2d 421 (1989). The statute neither mentions a "community justice center" nor defines "community-based facility."[13]
We construe an ambiguous statutory term to effectuate the Legislature's intent within the context of the entire statute, seeking to avoid strained, unlikely, or unrealistic consequences. Davis v. Dep't of Licensing, 137 Wash.2d 957, 963, 977 P.2d 554 (1999). We may give an agency's interpretation of an ambiguous statute "great weight" if the statute is within the agency's special expertise. Postema v. Pollution Control Hearings Bd., 142 Wash.2d 68, 77, 11 P.3d 726 (2000). An agency has the requisite expertise if it is "the agency charged with administration of the relevant statutes." Dep't of Ecology v. Theodoratus, 135 Wash.2d 582, 589, 957 P.2d 1241 (1998). As the agency charged with siting various Department operations, the Department has the requisite expertise. RCW 72.65.220; Clerk's Papers (CP) at 150-51.
The Department contends that (1) work release facilities require residential confinement in a "supervised facility ... for the housing of work release prisoners,"[14] RCW 72.65.020(1)(c) (emphasis added); and (2) other statutes sometimes expressly provide that a "community facility" is residential.[15] Similarly, *213 RCW 70.48.020, which provides definitions of other types of Department "facilities," refers solely to correctional facilities that provide some degree of housing or confinement for offenders, such as a "holding facility," a "detention facility," a "special detention facility," a "correctional facility," or a "jail." RCW 70.48.020(1)-(5).[16]
The Department provides a reasonable interpretation of an ambiguous statute within an area of its expertise. Therefore, we defer to its interpretation of RCW 72.65.220 that the statute applies only to community-based, residential facilities. Because the CJCenter does not in any way house offenders, the mandatory notice and public hearings requirements of RCW 72.65.220 do not apply.

2. No "adopted" CJCenter siting policy
Citizens next argue that the Department has "adopted" "[t]he notice and hearing process... modeled after RCW 72.65.220" that the Department used when it considered previous prospective Tacoma CJCenter sites. Citizens cite Nat'l Elec. Contractors Ass'n v. Riveland, 138 Wash.2d 9, 28, 978 P.2d 481 (1999), to support their argument that if "the Department exercises its discretion to comply with a statute as a matter of internal policy, even if a less stringent standard could have been adopted, the Department is bound to extend the protection in the statute uniformly thereafter." Br. of App. at 33.
Riveland, however, is distinguishable. In Riveland, the Legislature required the Department to "adopt standards" for inmate health and safety. Riveland, 138 Wash.2d at 26-27, 978 P.2d 481 (quoting RCW 72.09.135). As directed by statute, the Department adopted an express policy that the Washington Industrial Safety and Health Act (WISHA) would apply to "all inmates and DOC personnel." Riveland, 138 Wash.2d at 27-28, 978 P.2d 481. The Court held that the Department could not exclude a class of non-employee inmate-workers, ruling instead that the Department "must extend WISHA protection to all inmate workers" because the Department had "articulated its policy and intent to comply with WISHA." Riveland, 138 Wash.2d at 28, 978 P.2d 481 (emphasis added). Such is not the case here.
First, there is no comparable statute requiring the Department to adopt rules for providing public notice and hearings when siting a CJCenter. Second, unlike in Riveland, the Department here did not articulate an express policy or intent to comply with RCW 72.65.220's notice and hearing provisions when siting a CJCenter. Thus, contrary *214 to Citizens' argument, Riveland does not transform the Department's past notice and neighborhood hearing practices into a binding policy for other CJCenter sitings. Accordingly, we hold that the notice and hearing procedures of RCW 72.65.220 do not apply to the Department when siting a CJCenter.

C. Arbitrary and Capricious
Citizens next argue that the Department violated their due process rights by acting arbitrarily and capriciously in that (1) the Department previously spent more than a year on mailings, hearings, and community outreach when considering other justice center sites, but that it arbitrarily and capriciously stopped such practices when it pursued the Center Street site; (2) the Department refused to consider property devaluation and increased crime before selecting the Center Street site;[17] and (3) the Department should not have chosen Center Street when it could have chosen another site.
The Department responds that its selection (1) was the culmination of a "lengthy and careful search," utilizing the expertise of the state general administration office; and (2) involved exchange of information with Citizens. The record shows, for example, that the Department (1) went to "great lengths in the past year to advertise possible locations [for the CJCenter] and meet with citizens, legislators, city government officials and citizen groups," CP at 142; (2) issued press releases explaining the site selection; and (3) repeatedly offered to meet with Citizens, which offers Citizens declined.
An agency's action is "arbitrary and capricious" if it is "willful and unreasoning" in disregard of the facts and circumstances. See Theodoratus, 135 Wash.2d at 598, 957 P.2d 1241. Citizens has not shown that the Department's action in selecting the Center Street site meets this test.

III. Equal Protection
Using a similar argument, Citizens next claim an equal protection violation, arising out of the due process clause.[18] They argue that the Department intentionally treated the Center Street Neighborhood differently than other similarly situated Tacoma neighborhoods considered for the CJCenter because the Department held siting hearings in those other neighborhoods, but not in the Center Street neighborhood. Again, Citizens have failed to provide supported argument in their brief to show how the Department's action violates a due process/equal protection right.
For example, Citizens assert, "Citizens has demonstrated, for the purposes of summary judgment, that the Center Street Neighborhood was similarly situated as other neighborhoods that the Department considered for siting" the CJCenter. Br. of App. at 24-25. But nowhere do Citizens show how Center Street was "similarly situated" to the other neighborhoods; instead, they focus on the different ways the Department treated the various neighborhoods in providing notice, holding hearings, sending mailings, and deliberating about the site-selection for more than 30 days. Citizens have failed to support *215 their contention that the sites they compare were similarly situated.[19] RAP 10.3(a)(5).

IV. OFFENDER ACCOUNTABILITY ACT: STAFF DEPLOYMENT AND RISK ASSESSMENT
The Offender Accountability Act provides, in pertinent part:
To the extent practicable, the department shall deploy community corrections staff on the basis of geographic areas in which offenders under the department's jurisdiction are located, and shall establish a systematic means of assessing risk to the safety of those communities.
RCW 72.09.590.
Citizens argue that the Department was not entitled to summary judgment as a matter of law because the plain language of RCW 72.09.590 requires (1) deploying corrections officers in proportion to the offenders in a given community, and (2) assessing the risk a CJCenter will pose to that community. But Citizens fail to support their argument in their brief: They do not show legally or factually that the Department lacks expertise in deploying correctional officers, in assessing risks to the community, or in "establish[ing] a systematic means of assessing risk" as required under RCW 72.09.590.
Instead, Citizens contend that the Department's interpretation and application of RCW 72.09.590 conflict with (1) the Department's prior focus on community safety and "fair share" principles; (2) analogous statutory schemes for siting transition facilities for sex predators, which require public hearings and equitable distribution of facilities; (3) the express legislative intent that the Department's highest priority should be public safety; (4) principles of statutory construction that require interpreting RCW 72.09.590 and RCW 9.94A.030(5) "risk assessments" differently; and (5) legislative history clarifying that risk assessments must be based on communities.[20]
Again, an agency has the requisite expertise if it is "the agency charged with administration of the relevant statutes." Theodoratus, 135 Wash.2d at 589, 957 P.2d 1241. Such is the case here. As the Department points out, (1) RCW 72.09.590 gives the Department direction for assessing risk related to offenders and communities; (2) the Legislature has specially instructed the Department to deploy corrections officers on the basis of geographic area and to open five new "day reporting" centers around the State; and (3) the Department is charged with and has expertise in assessing community risk and deploying its staff.
Applying its expertise to the deployment of community corrections staff under RCW 72.09.590, the Department asserts that it need only deploy corrections officers to major metropolitan areas and assess the risk that individual offenders pose to the broader community, not to specific neighborhoods. First, RCW 72.09.590 is part of the Offender Accountability Act, also codified in part in RCW 9.94A, wherein "risk assessment" is defined to require "assessing an offender's risk." RCW 9.94A.030(35) (emphasis added). Second, the Offender Accountability Act does not define "community." As the Department argues, it would be unwieldy to assess the risk of a CJCenter to such an undefined specific neighborhood, rather than to the community at large.
Third, the Department argues that the relatively non-specific language of RCW 72.09.590 contrasts with the very clear language the Legislature has used when establishing conditions precedent to siting other types of Department facilities, such as in the work release facility siting statute, RCW 72.65.220. Finally, the Department notes *216 that deploying staff based on a neighborhood analysis of offender locations and community risk is impractical given that community-supervised offenders under the Department's jurisdiction change and move frequently.
Citizens have not challenged the Department's assertions that it has performed individual offender risk assessments, or that it has deployed corrections staff to major geographical locations. Because, therefore, there are no genuine issues of material fact, the trial court did not err in granting the Department summary judgment as a matter of law.

V. PUBLIC DISCLOSURE ACT
Citizens further contend that the Department responded inadequately to their public records request for offenders' addresses, addresses of reporting facilities that offenders currently attend, Department policies for managing political opposition to siting correctional facilities, and correctional facilities' effects on crime rates and property values.
The Public Disclosure Act requires that, on request, state and local agencies "make available for public inspection and copying all public records," unless the record falls within a specific exemption. RCW 42.17.260(1);[21]Tacoma Pub. Library v. Woessner, 90 Wash. App. 205, 212, 951 P.2d 357 (1998). RCW 42.17.310(1)(a) exempts from public inspection and copying all "[p]ersonal information in any files maintained for ... patients or clients of public institutions."[22] This exemption, which protects individuals' "right to privacy," is violated if disclosing the record "(1) [w]ould be highly offensive to a reasonable person, and (2) is not of legitimate concern to the public." Progressive Animal Welfare Soc'y v. Univ. of Washington, 125 Wash.2d 243, 254, 884 P.2d 592 (1994) (quoting RCW 42.17.255). But even if parts of a requested public record are exempt and, therefore, should be redacted, the non-exempt portions should be disclosed, and the reason for the redaction, fully explained. RCW 42.17.260(1); RCW 42.17.310(2), (4).

A. Offenders' AddressesFailure To Recite Exemption
Citizens requested disclosure of the "[a]ddress of each individual who will be required to report to the [Tacoma CJC] or who would be reporting to this facility if it were operating as of today's date." CP at 67. The Department provided the names of and zip codes for "offenders in the Pierce County area who could potentially be required to report to" the CJCenter. CP at 71. The Department did not, however, provide offenders' addresses; nor did it cite any exemption for its failure to disclose the addresses.
The Department asserts that Citizens have transformed their trial court PDA claim *217 that the Department's response was untimely into a new claim on appealthat the response was inadequate. We disagree. Citizens' complaint alleged that (1) it had "submitted a public disclosure request," (2) the Department had stated that the "request will be responded to within 15 business days," and (3) "DOC's response violates the law." CP at 9. Citizens specifically argued to the trial court that the Department had inadequately responded to its request in that it had "failed to provide addresses." CP at 316. Similarly, on appeal, Citizens specifically argue that the Department's failure to recite an explanation for its failure to provide the requested addresses violated the PDA.
The Department counters that it "completely" responded to Citizens' public records request because home addresses are "personal information" that the Department may not disclose under RCW 42.17.310(1)(a) (exempting "[p]ersonal information in any files maintained for ... patients or clients of public institutions") and WAC 137-08-150(1) (precluding disclosure of "[p]ersonal information in any files concerning a prisoner, probationer, or parolee"). Although the Department now cites a legal exemption for personal addresses, it did not recite this exemption in response to Citizens' request for offender addresses.
Thus, even assuming, without deciding, that the Department legally withheld offenders' addresses as exempt under RCW 42.17.310(1)(a), the Department nevertheless violated the PDA by failing to name and to recite to Citizens its justification for withholding the addresses. RCW 42.17.310(4) clearly provides,
Agency responses refusing, in whole or in part, inspection of any public record shall include a statement of the specific exemption authorizing the withholding of the record (or part) and a brief explanation of how the exemption applies to the record withheld.
Here, the Department did not include a statement of the specific exemption authorizing the withholding of the offenders' addresses and provided no explanation to Citizens in response to their request. Accordingly, the Department clearly violated this section of the PDA, RCW 42.17.310(4), and the trial court erred in granting summary judgment to the Department on this PDA claim. See Nast v. Michels, 107 Wash.2d 300, 306, 730 P.2d 54 (1986).

B. Offenders' Names
Citizens also argues that the Department failed to disclose information about all offenders, noting that it provided only 163 names, whereas earlier Department numbers indicated that the CJCenter would "oversee" as many as 866 offenders.[23] But the Department was required to furnish Citizens with copies of only those records that Citizens had requested, and Citizens had not requested this additional information. Smith v. Okanogan County, 100 Wash.App. 7, 12, 994 P.2d 857 (2000).[24]
Rather, Citizens had asked only for addresses of individuals "required to report" or "who would be reporting" to the CJCenter if it were open today. The Department explained the difference between the number of offenders the CJCenter would "oversee" or "supervise" and the number who would "report" to the CJCenter. Citizens did not ask for information relating to all individuals that the CJCenter would oversee; it requested information about only the much smaller subclass of "reporting" offenders.
Citizens do not deny that the Department provided the requested information on "reporting" *218 offenders. Accordingly, this argument fails.

C. Reporting Facility Addresses
Citizens also asked the Department for "[a]ddresses of facilities where each individual is currently reporting." CP at 67. In response, the Department provided a list of all Department offices in Pierce County, explaining, "Offenders from any of the Pierce County Offices may be required to report to the Community Justice Center for services, so a roster of all the offices has been provided." CP at 72. On appeal, Citizens argue, "What was requested was a list matching each offender with the facility that the offender currently reported to." Br. of App. at 44.
Again, the Department is required to furnish copies of only those records that Citizens specifically requested. Smith, 100 Wash.App. at 12, 994 P.2d 857. Citizens' public disclosure request asked for addresses of Department reporting facilities to which "individuals," who would potentially report to the Tacoma CJCenter, currently report. The Department provided a list of all Department reporting facilities and explained that individuals from any of these facilities could be required to report to the CJCenter. Thus, the Department gave Citizens exactly what they "requested," and this argument also fails.

D. Policies for Managing Political Opposition
In addition, Citizens asked the Department for "[p]olicies related to managing, controlling, influencing, minimizing, mitigating, or thwarting neighborhood or political opposition to the siting or operation of correctional facilities." CP at 68. In response, the Department provided "policies which have to do with siting procedures and information regarding the Community Justice for the West Coast Region." CP at 73. The disclosure coordinator also stated, "It is unclear to me exactly what you are requesting.... Please clarify what additional records you want if I have not interpreted your request accurately. Please contact me if you have any questions or clarifications to your request." CP at 73.
Citizens argue that the Department specifically failed to provide "a copy of its booklet prepared to assist Corrections staff in hosting community meetings." Br. of App. at 42. The booklet notes, "We need to assess our offenders based on risk and we need to assess place safety in order to plan for offender reintegration." CP at 323. Citizens argue that in failing to disclose this booklet, the Department failed to respond to its request adequately.[25]
But, again, the Department is required to furnish copies of only those records that Citizens specifically requested. Smith, 100 Wash.App. at 12, 994 P.2d 857. Citizens requested "policies" relating to the topic of "political opposition" to correctional facilities. As the Department notes, this "booklet" is not itself a "policy," or one related to the topic of "political opposition." Citizens do not argue that this booklet constitutes a "policy" or that the booklet is anything more than what it claims to bea "booklet" prepared "to assist" DOC staff "in hosting a community meeting." CP at 323. If Citizens wanted this hosting-community-meetings booklet, it could have requested more than just "policies related to ... political opposition to ... correctional facilities."[26]
*219 Because Citizens received the requested policies, laws, and directives related to siting correctional facilities, and Citizens do not otherwise challenge the Department's response to their request for policies, the trial court did not err in granting summary judgment to the Department on this ground.

E. Correctional Facility Effects on Crime and Property Values
Citizens also asked the Department for records on the:
9. Effect that correctional facilities, including correctional institutions, work release, prerelease, and day reporting facilities, have on property values in neighborhoods where correctional facilities are located.
10. Effect that correctional facilities, including correctional institutions, work release, prerelease, and day reporting facilities, have on safety and crime rates in neighborhoods where correctional facilities are located.
11. Effect that this facility will have on safety and crime rates in the Center Street neighborhood.
CP at 67-68.
The Department responded that (1) "there is no data available" indicating that the location of a correctional facility decreases property values or increases the crime rate, (2) the Department's experience suggests positive effects, and (3) the Department anticipates that the Tacoma CJCenter will also have "a positive effect" on the Center Street Neighborhood. The Department also provided two emails between the public disclosure coordinator and officials from the Seattle and Spokane CJCenters indicating no negative impacts resulting from these CJCenters.
Yet on appeal, Citizens argue that the Department (1) "produced none of the requested records"; and (2) instead, offered a response that was "speculative and unfounded and uninformed." Br. of App. at 46. Insofar as Citizens assert that the Department "produced none of the requested records," they imply that the Department should have created a record responsive to its request, even though no such records were available. But the law does not require creation of non-existent records in response to a public records disclosure request.[27]Smith, 100 Wash.App. at 13-14, 994 P.2d 857. Again, Citizens' claim fails.

VI. INJUNCTIVE RELIEF
In order to obtain an injunction, a party must show "a clear legal or equitable right." Kucera v. Dep't of Transp., 140 Wash.2d 200, 209, 995 P.2d 63 (2000) (quoting Tyler Pipe Indus. v. Dep't of Revenue, 96 Wash.2d 785, 792, 638 P.2d 1213 (1982)). Here, except for their PDA claim concerning withholding of offender addresses, all of Citizens' legal theories fail. Citizens predicated their request for injunctive relief on claims of rights that they do not have.[28] Therefore, Citizens have not shown that they are entitled to injunctive relief.

VII. ATTORNEY FEES

A. CHALLENGE TO AGENCY ACTION
Finally, Citizens request attorney fees under RCW 4.84.350(1), which allows a prevailing party to collect "reasonable attorneys' fees" when challenging an "agency action." For purposes of this statute, a party is considered to have prevailed only if that party obtains relief on a "significant issue." Hunter v. Univ. of Washington, 101 Wash. App. 283, 2 P.3d 1022 (2000), review denied, 142 Wash.2d 1021, 16 P.3d 1263 (2001) (quoting RCW 4.84.350(1)). Here, Citizens have prevailed on only one relatively minor PDA violation: the Department's failure to recite a claimed exemption for non-disclosure of requested offender addresses. Thus, they are not entitled to attorney fees under RCW 4.84.350.

*220 B. Under the PDA
The PDA, however, provides for a mandatory award of attorney fees and costs incurred in litigating any PDA violation:
Any person who prevails against an agency in any action in the courts seeking the right to inspect or copy any public record or the right to receive a response to a public record request within a reasonable amount of time shall be awarded all costs, including reasonable attorney fees, incurred in connection with such legal action. In addition, it shall be within the discretion of the court to award such person an amount not less than five dollars and not to exceed one hundred dollars for each day that he was denied the right to inspect or copy said public record.
RCW 42.17.340(4). See also Wood v. Lowe, 102 Wash.App. 872, 877, 10 P.3d 494 (2000). "Once a violation of the PDA has been established, courts are required to award reasonable attorney fees and statutory penalties." Yousoufian v. Office of King County Executive, 114 Wash.App. 836, 846-47, 60 P.3d 667 (2003) (citing RCW 42.17.340(4); King County v. Sheehan, 114 Wash.App. 325, 334, 57 P.3d 307 (2002)).
The Department does not contest that it failed to state a reason or an exemption when, in responding to Citizens' request, it excluded addresses of offenders expected to report to the CJCenter.
[T]he appropriate amount of penalties and attorney fees to award are matters within the trial court's discretion and subject to review only for an abuse of that discretion. Sheehan, 114 Wash.App. at 350-51, [57 P.3d 307] (noting that PDA "grants discretion to the trial court, not to this appellate court, to set the amount of the penalty within the minimum and maximum ranges").
Yousoufian, 114 Wash.App. at 847, 60 P.3d 667. Thus, remand to the trial court is necessary to determine what portion of Citizens' attorney fees and litigation costs are attributable to this single PDA violation.

C. On Appeal
Because they have not prevailed, Citizens are not entitled to attorney fees on appeal under RAP 18.1.[29]

CONCLUSION
Citizens argue for greater inclusion of neighborhood participation in the Department's CJCenter siting decisions. But the law presently does not require such inclusion, and any change is for the Legislature to make, not the courts.
Accordingly, we affirm the trial court's grant of summary judgment to the Department on all grounds, except for Citizens' claim that the Department violated the PDA when it failed to state its reason, or the claimed exemption, for withholding the requested offenders' addresses. As for this latter PDA claim, we reverse summary judgment and remand to the trial court (1) to determine what portion of Citizens' litigation costs, including attorney fees, are attributable to this single PDA violation; and (2) to order the Department to pay that amount to Citizens under RCW 42.17.340(4).
We concur: MORGAN and HOUGHTON, J.
NOTES
[1] WASH. CONST. art. I, § 3.
[2] Chapter 42.17 RCW.
[3] Citizens claim that the Tacoma CJCenter will supervise about 800 released offenders, which the Department disputes.
[4] The Tacoma City Council had prohibited siting Department facilities in "narc zones," with heavy drug traffic, until March 2002. There is some indication that the courts and the land use administrator might have authorized the Department to build the CJCenter at these sites. But the Department viewed the moratorium as one of several obstacles to siting the CJCenter at either location.
[5] Chapter 72.09 RCW.
[6] Chapter 43.19 RCW.
[7] 42 U.S.C. § 1983 (Deprivation of Rights); 42 U.S.C. § 1085 (Conspiracy to Interfere with Civil Rights).
[8] Chapter 42.17 RCW.
[9] WASH. CONST. art. I, § 3.
[10] Chapter 34.05 RCW.
[11] Despite Citizens' Assignment of Error to dismissal of the "entire complaint," they argue only these three dismissed claims in their brief.
[12] Citizens also argue that a siting "risk assessment" is necessary to avoid "tipping" a "fragile or at-risk community" into "disorder and decline." We do not consider this argument because Citizens cite no supporting authority for it, contrary to RAP 10.3(a)(5).
[13] Recourse to the plain meaning of "facility" is also unhelpful. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 812-13 (3d ed.1968) defines "facility" as "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end." Here, it is unclear whether the "particular end" a CJCenter would serve has a residential component.
[14] Citizens argue for the first time on appeal that the Department has defined "[a]dditional correctional facility" as "a preexisting building heretofore not used by the department as a correctional facility which is reopened for use in housing or servicing inmates." WAC 137-12A-020(6)(c) (emphasis added). Br. of App. 30-31. Generally, we do not consider an argument raised for the first time on appeal. RAP 2.5(a). And in any event, Citizens provide no example of a correctional facility that does not house offenders.
[15] See, e.g., RCW 72.05.020 ("As used in this chapter, unless the context requires otherwise: (1) `Community facility' means a group care facility operated for the care of juveniles committed to the department under RCW 13.40.185.")
[16] RCW 70.48.020 provides the following definitions:

As used in this chapter the words and phrases in this section shall have the meanings indicated unless the context clearly requires otherwise.
(1) "Holding facility" means a facility operated by a governing unit primarily designed, staffed, and used for the temporary housing of adult persons charged with a criminal offense prior to trial or sentencing and for the temporary housing of such persons during or after trial and/or sentencing, but in no instance shall the housing exceed thirty days.
(2) "Detention facility" means a facility operated by a governing unit primarily designed, staffed, and used for the temporary housing of adult persons charged with a criminal offense prior to trial or sentencing and for the housing of adult persons for purposes of punishment and correction after sentencing or persons serving terms not to exceed ninety days.
(3) "Special detention facility" means a minimum security facility operated by a governing unit primarily designed, staffed, and used for the housing of special populations of sentenced persons who do not require the level of security normally provided in detention and correctional facilities including, but not necessarily limited to, persons convicted of offenses under RCW 46.61.502 or 46.61.504.
(4) "Correctional facility" means a facility operated by a governing unit primarily designed, staffed, and used for the housing of adult persons serving terms not exceeding one year for the purposes of punishment, correction, and rehabilitation following conviction of a criminal offense.
(5) "Jail" means any holding, detention, special detention, or correctional facility as defined in this section.
The statute's only other mention of a "facility" is under its definition of "health care," which includes "preventive, diagnostic, and rehabilitative services provided by licensed health care professionals and/or facilities," including "providing prescription drugs." RCW 70.48.020(6). This section, however, does not describe a type of Department facility; rather, it uses the term facility in conjunction with health services provided by a professional facility, for example, a hospital.
[17] In support of this second argument, Citizens cite Dep't of Corr. v. City of Kennewick, 86 Wash. App. 521, 534, 937 P.2d 1119 (1997), review denied, 134 Wash.2d 1002, 953 P.2d 95 (1998), in which the court considered similar community concerns about the siting of a work release facility. But the court held that "generalized" fears of a neighborhood "that are not substantiated are not relevant" under the work release siting statute. Kennewick, 86 Wash.App. at 533-34, 937 P.2d 1119.

Citizens attempt to circumvent the Kennewick "generalized fear" deficiency with the Menke Declaration, which hypothesizes that "at risk" neighborhoods such as Center Street face a unique risk of increased crime and property devaluation in the face of a "small increase in the level of fear or disorder" that the CJCenter would bring about. CP at 28-29. But this attempt fails because Menke neither bases his conclusions on any facts relating to other Department offices or CJCenters, nor explains how increasing the number of officers with arrest authority might increase the crime rate. In short, these unsupported fears are not specifically tied to the CJ Center and, therefore, suffer from the same "generalized" label as did the citizens' fears in Kennewick.
[18] WASH. CONST. art. I § 3 (due process); U.S. CONST. amend. XIV (equal protection). Cruz v. Town of Cicero, 275 F.3d 579, 587 (7th Cir.2001).
[19] And it seems unlikely that Citizens could support this argument in light of the Department's evidence that the other potential sites it previously considered were not "similarly situated." For example, previous sites were differently zoned as "narc areas," subject to a city moratorium on DOC facilities, which substantially compromised the siting of a CJCenter in those areas. Citizens offers no explanation why the Center Street neighborhood was not zoned as a "narc area."
[20] Citizens also argue that there is a genuine issue of material fact about whether the Department actually deployed its staff "to the locations where the offenders are located [sic]." Br. of App. 16. But Citizens did not make this argument to the trial court; rather, they raise it for the first time on appeal. Consequently, we do not consider it. RAP 2.5(a).
[21] RCW 42.17.260(1) provides:

Each agency, in accordance with published rules, shall make available for public inspection and copying all public records, unless the record falls within the specific exemptions of subsection (6) of this section, RCW 42.17.310, 42.17.315, or other statute which exempts or prohibits disclosure of specific information or records. To the extent required to prevent an unreasonable invasion of personal privacy interests protected by RCW 42.17.310 and 42.17.315, an agency shall delete identifying details in a manner consistent with RCW 42.17.310 and 42.17.315 when it makes available or publishes any public record; however, in each case, the justification for the deletion shall be explained fully in writing.
[22] In relevant part, RCW 42.17.310 provides: 
(1) The following are exempt from public inspection and copying:
(a) Personal information in any files maintained for students in public schools, patients or clients of public institutions or public health agencies, or welfare recipients.
. . . .
(2) Except for information described in subsection (1)(c)(i) of this section and confidential income data exempted from public inspection pursuant to RCW 84.40.020, the exemptions of this section are inapplicable to the extent that information, the disclosure of which would violate personal privacy or vital governmental interests, can be deleted from the specific records sought. No exemption may be construed to permit the nondisclosure of statistical information not descriptive of any readily identifiable person or persons.
. . . .
(4) Agency responses refusing, in whole or in part, inspection of any public record shall include a statement of the specific exemption authorizing the withholding of the record (or part) and a brief explanation of how the exemption applies to the record withheld.
[23] Citizens also argue that (1) withholding the addresses diminished its ability to show that the Department was not deploying officers to the areas where offenders reside, and (2) giving information about only 163 offenders raised doubts about earlier numbers the Department had provided. But addresses of offenders, whether 163 or 800, all within Pierce County cannot not create a material fact as to whether the Department violated RCW 72.09.590 because the Department was obligated to deploy officers only to major metropolitan areas. See Section IV or our Analysis, supra.
[24] See also Bonamy v. City of Seattle, 92 Wash. App. 403, 409, 960 P.2d 447 (1998) ("Nor does the act require public agencies to be mind readers. A public agency cannot be expected to disclose records that have not yet been requested"), review denied, 137 Wash.2d 1012, 978 P.2d 1099 (1999).
[25] Citizens also argue that the booklet is relevant to its RCW 72.65.220 theory that notice and hearings are required prior to siting the CJCenter. But the booklet (1) does not discuss whether the CJCenter is a "facility," and (2) does not articulate an express policy and intent that CJCenter sitings will follow the RCW 72.65.220 siting process; it merely offers strategies to "engage the public" during community meetings. See supra, Section I.B.
[26] In Bonamy, 92 Wash.App. at 410-11, 960 P.2d 447, the court considered an employee's email stating, "I want to know what policy guidelines govern investigations [of] ... a personal complaint by one employee against another" and also asking various questions, which provides a helpful approach for agencies who receive requests of a "broad nature." Bonamy, 92 Wash.App. at 410-11, 960 P.2d 447. The court held that an agency is "perfectly justified in seeking clarification" of the unclear request. Bonamy, 92 Wash.App. at 410, 960 P.2d 447. Here, the Department specifically asked Citizens for clarification of the records sought, and Citizens did not provide this clarification.
[27] Additionally, Citizens did not brief the trial court on the deficiencies in the Department's disclosures regarding property values and crime rates. Accordingly, we do not consider this argument. RAP 2.5(a).
[28] Citizens did not predicate their request for an injunction on the one claim on which they have prevailed on appeal the single PDA violation for failure to state the exemption for offenders' addresses. Nor do Citizens argue that a PDA violation is grounds for injunctive relief.
[29] The Department, the prevailing party on appeal, has not requested attorney fees. It requests only that we deny attorney fees to Citizens.